UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|                      |   |                           |
|----------------------|---|---------------------------|
| HSqd, LLC            | : |                           |
|                      | : |                           |
|                      | : |                           |
| v.                   | : | CIV. NO. 3:11CV1225 (WWE) |
|                      | : |                           |
| PAUL MORINVILLE      | : |                           |

RULING ON PLAINTIFF'S APPLICATION
FOR PREJUDGMENT REMEDY [doc. #74]

Plaintiff HSqd, LLC brings this action to recover damages from defendant Paul Morinville arising out of the breach of an alleged partnership. [Doc. #1, Complaint, ¶ 1].  HSqd is a Connecticut limited liability company, controlled by a sole member manager, Brian Hollander.  "HSqd's business is to partner with individuals and companies who own intellectual property for the purpose of successfully monetizing specified intellectual property by actively participating in all monetization related decisions, and where appropriate, raising and/or providing the capital needed to support the monetization program." (Hollander Decl., Doc. #74-1, at ¶6).  In January 2010, Brian Hollander was introduced to Paul Morinville, the owner of a U.S. patent portfolio, which consisted of pending patent applications and infringed patents generating revenue ("Patent Portfolio").  Between January 2010 and January 2011, Hollander and Morinville

engaged in negotiations to jointly pursue a patent monetization program.  Plaintiff alleges that a partnership was formed and that defendant breached the alleged partnership agreement, and additionally made an unauthorized sale of certain patents for defendant's sole financial benefit. Defendant disputes the formation of a partnership.

Plaintiff seeks a prejudgment remedy on the basis of his claims that defendant breached the partnership agreement and/or was unjustly enriched. Defendant argues that the unjust enrichment claim was not properly before the Court. The Court, having reviewed the PJR application, will consider the PJR Application as to plaintiff's claims of breach of partnership agreement and unjust enrichment.

Plaintiff moves for a prejudgment remedy against defendant in the amount of 30% of the gross recoveries that Morinville obtained from Oracle and Aegis USA. [Doc. #74]. A hearing was held on May 6, June 26 and 27, and August 13, 2013.

In support of its application for entry of a PJR, plaintiff presented the testimony of Brian Hollander. Opposing plaintiff's motion, defendant offered the testimony of Paul Morinville.

2

I. <u>PROBABLE CAUSE STANDARD</u>

Although the federal civil rules govern the conduct of an action in federal court, state law determines when and how a provisional remedy is obtained. <u>See</u> Fed.R.Civ.P. 64; <u>Bahrain Telecommunications Co. v. DiscoveryTel, Inc.</u>, 476 F. Supp. 2d 176, 183 (D.Conn. 2007). Under Connecticut law, a prejudgment remedy is intended to secure the satisfaction of a judgment should the movant prevail. <u>See</u> <u>Cendant Corp. v. Shelton</u>, No. 3-06-cv-854 (JCH), 2007 WL 1245310 at *3 (D. Conn. April 30, 2007). To grant a motion for prejudgment remedy of attachment, the court must make a finding of "probable cause." Connecticut General Statutes § 52-278c(a)(2) requires that the application include:

> An affidavit sworn to by the plaintiff or any competent affiant setting forth a statement of facts sufficient to show that there is probable cause that a judgment in the amount of the prejudgment remedy sought, or in an amount greater than the amount of the prejudgment remedy sought, taking into account any known defenses, counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff.

Connecticut General Statute §52-278d provides that a PJR hearing is limited to a determination of "whether or not there is probable cause that a judgment in the amount of the prejudgment remedy sought, taking into account any defenses,

counterclaims or set-offs, will be rendered in the matter in favor of the plaintiff."

"Probable cause," in the context of a prejudgment remedy, has been defined by Connecticut courts as "a bona fide belief in the existence of the facts essential under the law for the action and such as would warrant a man of ordinary caution, prudence and judgment, under the circumstances, in entertaining it." Three S. Dev. Co. v. Santore, 193 Conn. 174, 175 (1984) (quotation marks and citation omitted).

In other words, in addressing PJR applications, the "trial court's function is to determine whether there is probable cause to believe that a judgment will be rendered in favor of the plaintiff in a trial on the merits." Calfee v. Usman, 224 Conn. 29, 36-37 (1992) (citation omitted).  A probable cause hearing for the issuance of a prejudgment remedy "is not contemplated to be a full scale trial on the merits of the plaintiff's claim." Id. at 37.  The plaintiff need only establish that "there is probable cause to sustain the validity of the claim." Id. Probable cause "is a flexible common sense standard.  It does not demand that a belief be correct or more likely true than false." New England Land Co. v. DeMarkey, 213 Conn. 612, 620 (1990) (citation omitted).  "[T]he Court must evaluate not only the plaintiff's claim but also any defenses raised by the

4

defendant." Haxhi v. Moss, 25 Conn. App. 16, 20 (1991) (citation omitted).

Moreover, "damages need not be established with precision but only on the basis of evidence yielding a fair and reasonable estimate." Burkert v. Petrol Plus of Naugatuck, Inc., 5 Conn. App. 296, 301 (1985) (citation omitted).

II. FINDINGS

After considering the evidence presented, the Court finds the following facts for the limited purpose of deciding the instant PJR.

Plaintiff HSQD is an LLC created for the purpose of investing in intellectual property. Brian Hollander is the principal of HSQD. Defendant Paul Morinville is an entrepreneur and inventor. In May 1996, Morinville was hired by Dell as a contract recruiter in the Corporate Department. Then, in November 1997, Dell hired Morinville as a full-time employee to work primarily in the areas of staffing and development of training programs. Morinville signed an employment agreement with Dell. During his time at Dell, Morinville identified a need for software that would streamline the process for adding new employees to a company's computer system. In 1999, Morinville worked on an invention that would help with these organizational

challenges, and told Alex Smith, Managing Director of Dell Ventures, about these inventions. Dell expressed interest in Morinville's inventions, and requested that Morinville prepare a business plan, which was completed in late December of 1999 or early January of 2000. Morinville terminated his employment with Dell on April 3, 2000, and a couple of months later learned that Dell was no longer interested in investing in his inventions. Morinville pursued the patents on his inventions independently. At some point, Morinville learned that several companies were infringing on his patents, and he became interested in monetizing his patents by bringing patent infringement actions. In January 2010, Hollander was introduced to Morinville's attorney, Steven Sprinkle, and learned that Morinville was looking for funding to enforce his patents.

In anticipation of negotiations, on January 14, 2010, Hollander and Morinville through their attorneys executed a non-disclosure agreement ("NDA") to protect confidential information exchanged from unauthorized disclosure or use. [ex. 540]. The NDA provided, in part, that

> Morinville and Hsqd recognize that there is a need to disclose to one another certain information of each party for the purposes of evaluating a potential transaction involving certain of Morinville's patents and/or other assets (the "Business Purpose"), and to protect such information from unauthorized use and disclosure.

Hollander and Morinville's first direct contact was on January 15, 2010, through a telephone conference call. Also on the call was Steven Sprinkle. Morinville described the telephone call as a "get to know you call"; Hollander testified that substantive terms were discussed during the call, such as compensation and final decision-making authority. Both parties agree that Hollander inquired whether Morinville had an employment agreement with Dell, which could affect Morinville's patent ownership rights. This issue was of particular concern to Hollander who, on December 30, 2009, learned that a patent enforcement case he financed was dismissed for lack of standing, when the court found that the plaintiff did not own the rights to the patents.[1]

Sprinkle e-mailed Hollander a copy of Morinville's Dell employment agreement on the morning of February 4 [ex. 5]. On that same day, Sprinkle, Hollander, and Morinville participated in a conference call to discuss the employment agreement. Hollander conveyed to Morinville and Sprinkle that, based on his review of the employment agreement, Dell was and had always been the sole owner of the patents. Hollander was unwilling to move forward until Morinville obtained a patent assignment or release

---

[1] The Court takes judicial notice of the case, ESN, LLC v. Cisco Systems, Inc., Civil Action No. 5:08cv20 (DF) (E.D. Tex.

from Dell.  Morinville and Sprinkle focused their efforts on
obtaining an assignment from Dell. On March 29, 2010, Sprinkle
emailed Hollander a copy of a draft "Patent Release Agreement"
[doc. #517] and wrote, "please give me any comments and let me
know if we got this approved by Dell if this would satisfy your
requirements on the ownership issue." On May 11, Hollander
reached out to Sprinkle, inquiring where they stood with Dell
and what the anticipated schedule was for focusing on
litigation. That same day, Sprinkle responded that Dell had
agreed and they were discussing execution of the assignment.
Sprinkle wrote, "As far as moving forward with litigation I
think the issue before us all at this point is the terms under
which you would be willing to find [sic] the costs." [doc. #
523], to which Hollander responded, "I'm ready to have that
discussion."  By early June 2010, Morinville had the assignment
from Dell.

In June, Morinville began sending Hollander file folders
for the organizational patent families as well as market
information Morinville had amassed during 10 years of working
with the patents. In mid-August, Morinville sent Hollander
information on potential target companies. Hollander could not
recall any specific companies he had helped identify as

---

Dec. 30, 2009) (hereinafter the "Cisco case").

potential targets.

Also in June, Morinville sought to terminate his relationship with Sprinkle because he believed Sprinkle's law firm did not have the capability to deal with the volume of litigation that would ensue. Morinville had a conversation with Hollander about hiring a new lawyer. Hollander introduced Morinville to Peter McAndrews; Morinville first spoke to McAndrews in mid-July and then again in mid-August, but did not retain him.  Peter McAndrews introduced Morinville to Matthew McAndrews, his brother and an attorney at Niro, Haller & Niro, who was interested in taking on the case.

For Morinville, the terms of the contract with the law firm that would represent him in the patent infringement actions - whether it was a full contingency or half contingency- were vital to arriving at an agreement with Hollander. Stated differently, the percentage that Morinville was willing to agree to with Hollander depended largely on the way the law firm would be billing for its services. From October through December, Morinville, Hollander and the McAndrews undertook their due diligence.

At the end of December 2010, Hollander sent Morinville a Letter of Intent, which was drafted by Hollander's attorneys [ex. 504]. It stated, in pertinent part,

> This letter (the "Letter") summarizes our intention to enter into an agreement (the "Agreement") to monetize your patents described in Exhibit C (the "Patents") through a licensing and litigation program (the "Program"). [. . .] The specific terms and conditions of the Transaction shall be set forth in an Agreement to be finalized between the Parties. We each agree to work together in good faith to execute a mutually satisfactory Agreement in time to file the first lawsuit in the Program. HSqd will prepare the first draft of the Agreement. Each party shall bear its own legal and other expenses required to finalize the Agreement.

At the same time, Morinville received the first draft of an engagement letter from Niro, Haller & Niro [Ex. 535]. Morinville did not sign the letter of intent or the engagement letter.

On January 4, 2011, there was a meeting in Chicago with Hollander, Morinville, and, Peter and Matthew McAndrews. At that meeting, Matthew McAndrews told Morinville that an investment of $250,000, and not $1 million like Morinville previously thought, would be needed to pursue the litigation. [ex. 17]. Morinville spoke to Hollander about the fact that based on these new numbers he believed that the risk to Hollander had decreased, and urged Hollander to reconsider his demand for 30% of gross proceeds on the patent monetization efforts. On January 10, Morinville sent Hollander an e-mail [ex. 17], subject line "Our deal". In that e-mail, Morinville outlined the history of the negotiations up to that point and his view that the deal as proposed was not acceptable to him. Morinville opens the e-mail

stating,

> [w]e need to nail down our deal before we discuss the
> patents any further" and ends the e-mail stating "[a]t this
> point we don't have a deal and we are so far apart that a
> deal appears unlikely. [. . .] I want to say again because
> I really do mean it. I want to work with you and Peter, but
> I can't do it with the terms on table. I'll be on my cell
> if you want to talk. [ex. 17].

After this e-mail, Hollander and Morinville spoke on the
telephone, but were unable to reach an agreement. That was the
last time Morinville and Hollander spoke. Eventually, Morinville
sold his patents to OrgStructure, which licensed the patents to
Oracle. [Exs. 38, 39]

III. DISCUSSION

A. Choice of Law

Initially, the parties disagreed on whether Connecticut or
Indiana partnership law governed the dispute and suggested that
there might be a conflict between the two states. Upon further
research into the issue, the parties agreed that, at least for
purposes of the PJR, there is no conflict between Connecticut
and Indiana law on the definition of partnership. Brown v.
Strum, 350 F.Supp.2d 346 (D. Conn. 2004) ("The threshold choice
of law question in Connecticut is whether there is an outcome
determinative conflict between the applicable laws of the states
with a potential interest in the case.") Based on the parties'

11

position that there is no conflict between the applicable laws of the states with an interest in the case, there is no need to perform a choice-of-law analysis and the law common to the jurisdictions will be applied. Id.

  B. Breach of Partnership

     In Count One, plaintiff alleges that defendant breached the partnership agreement. Specifically, plaintiff alleges that a "[p]artnership was formed to acquire and monetize the Dell Patents and the rest of the Patent Portfolio" and that on or about January 10, 2011, defendant materially breached the Partnership Agreement, causing plaintiff to suffer significant financial losses and lost business opportunities. [Doc. #1, ¶¶37, 44, 45]. Plaintiff alleges that the "purpose of the partnership was to obtain the Dell Patents, maximize the monetization value of the Patent Portfolio through licensing and litigation, share the profits based upon agreed percentages of Gross Proceeds and to jointly make all management and monetization decisions." [Id. ¶38]. Defendant disputes the existence of a partnership.

     A claim for breach of partnership agreement depends upon the existence of a valid partnership agreement. "To form a valid and binding contract there must be mutual understanding between the parties of the essential terms that are definite and

12

certain." <u>Ubysz v. DiPietro</u>, 185 Conn. 47, 51 (1981). Whether an oral partnership agreement has been entered is a question of fact. <u>Jacobs v. Thomas</u>, 18 Conn. App. 218, 222, cert. denied 212 Conn. 806 (1989). "While an oral agreement may be proved to have been reached even if some of the terms are not agreed to immediately, numerous Connecticut cases require definite agreement on the essential terms of an enforceable agreement ..." <u>Willow Funding Company L.P. v. Grencom Associates</u>, 63 Conn. App. 832, 843-45, 779 A.2d 174 (2001).

A partnership is a contractual relation, which may be implied from conduct and circumstances alone. <u>See</u> 59A Am. Jur. 2d Partnership § 89. Connecticut General Statutes § 34-314(a) defines the formation of a partnership as follows: "the association of two or more persons to carry on as co-owners a business for profit forms a partnership, whether or not the persons intend to form a partnership." In determining whether a partnership is formed, ... "[a] person who receives a share of the profits of a business is presumed to be a partner in the business ...." C.G.S. § 34-314(c)(3). Also, "a mutual agency relationship is[, generally,] an essential element of a partnership." <u>Davies v. General Tours, Inc.</u>, 63 Conn. App. 17, 20 (2001) (citation omitted).

Other elements of a partnership, as expressed by the

13

courts, generally include,

> an association of persons to combine property, money,
> effects, skill, and knowledge under a contract or agreement
> to carry out a lawful business enterprise for profit; co-
> ownership of the business enterprise; the conduct or
> contemplation of business activity; a community of interest
> in the business profits, management, and control; and the
> sharing of profits and losses from the business enterprise.

59A Am. Jur. 2d Partnership § 131.

In light of the evidence, the Court finds that there is not probable cause to believe that the parties formed a partnership. While there is no dispute that Morinville and Hollander undertook discussions and took affirmative steps to explore the possibility of partnering to pursue patent monetization on Morinville's patents, there is a sheer lack of evidence that the parties entered into a partnership.

First, contrary to plaintiff's allegations, the parties never agreed on any substantive terms which would govern the business relationship. Specifically, the parties never agreed on how much money Hollander would contribute; how Hollander would be repaid for his contributions; the percentage distributions on any gross proceeds; which law firm would undertake the litigation; which patents would be monetized; or how disagreements or decisions would be handled. This stands in stark contrast to Hollander's work in the Cisco case, where

14

there was an agreement for a 50-50 split of the profits, and where Hollander raised $2 million to cover litigation expenses. [Ex. 501, Plaintiff's Objections and Supplemental Responses to Defendant's 1st Set of Interrogatories, Int. #2].

Furthermore, the parties' interactions, as memorialized in the e-mails, show that Morinville and Hollander had an ongoing dialogue about the potential for a partnership if they could agree on the material terms. This is highlighted in the unsigned December 22, 2010 Letter of Intent [ex. 504]. That letter, drafted call by Hollander's attorneys almost a year after the initial telephone, explicitly stated that up to that point the parties were engaged in due diligence and that, pursuant to that due diligence, the parties intended to enter into an agreement.[2] Also, in the last e-mail Morinville sent Hollander, Morinville wrote, "we need to nail down our deal before we discuss the patents any further" and concluded, "[a]t this point we don't have a deal and we are so far apart that a deal appears unlikely." [Ex. 17]. In short, there was no agreement on the essential terms of a partnership.

---

[2] "This letter summarizes our intention to enter into an agreement
     […]
     Morinville has fully cooperated with HSqd to enable it to complete its due diligence in a timely and expeditious manner." [Ex. 504].

Second, contrary to Hollander's assertion that he was engaged by Morinville to work "day and night" toward the patent monetization, the overwhelming evidence reveals that Hollander's work was limited to the preliminary exploration of the possibility of a business venture or partnership.  For example, the evidence reveals that Hollander did not review the file histories for Morinville's patents, he did not secure funding from investors, and he did not identify potential infringement targets. With regard to Hollander's claim that his expertise and efforts contributed to the Dell patent assignment, the Court finds that based on Hollander's recent experience with the Cisco case, Hollander made the Dell patent assignment a condition to moving forward with negotiations with Morinville. Moreover, the evidence reveals that Hollander's involvement with the Dell patent assignment was limited to reading Morinville's employment agreement for a couple of hours, his concluding that Morinville needed to secure a patent assignment from Dell, and approving the patent assignment after Morinville and Sprinkle secured it from Dell.  Simply, Hollander's work was not for the benefit of Morinville, but part of his own due diligence to determine whether to partner with Morinville to fund a patent monetization program.

Third, Morinville and Hollander did not conduct themselves

like partners. For example, Hollander never paid Morinville the $3,000 a month stipend that was contemplated in the Letter of Intent and Hollander did not raise or invest specific sums of money for the partnership. See Builders Hardware v. DiPietro, 2001 WL 1231864 (Conn. Super. Ct. Sept. 25, 2001) (finding no partnership where parties did not conduct themselves like partners as evidenced by fact that there was no name for the alleged partnership; not tax identification numbers, no tax returns filed by the partnership, and no separate liability insurance for the partnership).

The Court is sensitive to the flexible and low standard that governs this proceeding. See Marlin Broadcasting, LLC v. Law Office of Kent Avery, LLC, 101 Conn. App. 638 (2007). However, based on the record before the Court, the Court finds that there is not probable cause to believe that Hollander and Morinville entered into a partnership for the purpose of monetizing Morinville's patents.

C. Unjust enrichment

In the alternative, plaintiff alleges that defendant was unjustly enriched by "taking the value and knowledge of HSqd for his own benefit and sold and assigned the Partnership's principal asset, the Dell Patents, to Org Structure and other unknown persons and entities." [Ex. 502, Complaint ¶80].

17

Plaintiff further alleges that it is entitled "to the realized value of its contribution to Morinville's acquisition of the Dell Patents and any other patent properties listed on Appendix A" and "to the realized value of its contribution to the patent monetization program that has been employed by Morinville, or for his benefit, by others including Org Structure". [Ex. 502, Complaint ¶¶84-85].

It is well settled that,

> Unjust enrichment applies 'wherever justice requires compensation to be given for property or services rendered under a contract, and no remedy is available by an action on the contract.' 5 Williston, Contracts (Rev. Ed.) § 1479. A right of recovery under the doctrine of unjust enrichment is essentially equitable, its basis being that in a given situation it is contrary to equity and good conscience for one to retain a benefit which has come to him at the expense of another. Franks v. Lockwood, 146 Conn. 273, 278, 150 A.2d 215 (1959); Schleicher v. Schleicher, 120 Conn. 528, 534, 182 A. 162 (1935). Connecticut National Bank v. Chapman, 153 Conn. 393, 399, 216 A.2d 814 (1966). 'With no other test than what, under a given set of circumstances, is just or unjust, equitable or inequitable, conscionable or unconscionable, it becomes necessary in any case where the benefit of the doctrine is claimed, to examine the circumstances and the conduct of the parties and apply this standard.' Cecio Bros., Inc. v. Greenwich, 156 Conn. 561, 564-565, 244 A.2d 404, 406.

> Providence Electric Co. v. Sutton Place, Inc., 161 Conn. 242, 246 (1971).

"'Unjust enrichment is, consistent with the principles of equity, a broad and flexible remedy." Cecio Bros., Inc., 156 Conn. at 564. "Plaintiffs seeking recovery for unjust enrichment

must prove (1) that the defendants were benefited, (2) that the defendants unjustly did not pay the plaintiffs for the benefits, and (3) that the failure of payment was to the plaintiffs' detriment." Hartford Whalers, 231 Conn. at 283 (Internal quotation marks and citations omitted).

As to the first prong, that defendant was benefitted, the Court does not find probable cause to believe that Morinville derived a benefit from his dealings with Hollander. As stated earlier, the dealings between Hollander and Morinville were part of due diligence undertaken by both parties to determine whether it would be mutually beneficial to become partners and pursue a patent monetization program. During the course of this due diligence, Hollander provided Morinville with support when Morinville terminated Sprinkle. The Court finds that this was part and parcel of the ongoing negotiations and that there is no evidence that this support benefitted defendant.

The Court further rejects the argument that the defendant was benefitted by plaintiff's expertise in that defendant received a release from Dell, which he otherwise would not have pursued and obtained. As stated earlier, the defendant sought the release from Dell in order to satisfy Hollander's preliminary requirements. There is no evidence that the Dell assignment, which was driven by Hollander, was necessary to

Morinville's patent monetization. Based on the record, the Court finds that the assignment of the Dell patent, driven by Hollander's negative experience in the Cisco case, to have been of questionable value to Morinville.

The Court does not find that the defendant was unjustly benefitted by his relationship with Hollander. The purpose of the ongoing negotiations between Hollander and Morinville was to conduct due diligence, with an eye toward forming a partnership through which both parties would financially benefit. The time spent by Hollander was not for the benefit of Morinville, but for the benefit of Hollander, who hoped to pursue patent monetization with Morinville and make a good return on his investment. As such, the Court finds that there is not probable cause to establish the first element of unjust enrichment, that defendant was benefitted.

Not having established the first prong, the Court denies plaintiff's motion for prejudgment remedy as to its unjust enrichment claim.


IV. <u>CONCLUSION</u>

Based on the foregoing, plaintiff's Application for a Prejudgment Remedy **[doc. #74]** and Motion for Disclosure of

Assets [doc. #76] are **DENIED.**[3]


        Entered at Bridgeport this 17th day of September 2013.


                        _____/s/_____
                        HOLLY B. FITZSIMMONS
                        UNITED STATES MAGISTRATE JUDGE

---

        [3] See  Aetna Life Ins. Co. v. Toothsavers Dental Serv., No.
96 CV 570 (GLG), 1997 WL 102453 (D. Conn. Feb. 4, 1997) (finding
referral to Magistrate Judge "for the purpose of a hearing on
prejudgment remedy" was a request for a determination of the
prejudgment remedy pursuant to 28 U.S.C. §636(b)(1)(A) and was
not a recommended ruling effective only upon a District Court
Judge's review and adoption, pursuant to 28 U.S.C.
§636(b)(1)(B)).